Markel v. Union of Orthodox Jewish Congregations of America, Case No. 23-55088. Good morning, Your Honors. May it please the Court? Michael Friedman on behalf of Appellant Markel, I'd request to reserve five minutes for rebuttal, and I'll keep an eye on the clock here. The issue presented in this case is whether, when a corporation claims it's a religious organization, it's then exempted from all federal and state regulations requiring that they pay their employees and workers. The District Court here, after more than an hour of oral argument, concluded that there is no binding authority on this issue. There is no Supreme Court case, no Ninth Circuit case. On which issue? On whether the corporation is a religious organization? No, on the issue of whether Markel's claims should be summarily adjudicated. The issue here is, and we present a series of arguments, but the primary argument, and I think our strongest argument, is that the ministerial exception, while legitimate and limited, does not reach the claims presented in this case. Typically, and in all the ministerial exception cases, Hosanna-Tabor, Morsi-Beru, this Court's decision in Alcazar, the question was is there a religious organization? Is there a minister? And then the third issue is does the claim presented by the plaintiff require the adjudication of a religious autonomy issue? The issue of... Although that third issue, I don't see the Supreme Court as having said that's necessary to decide in a religious... You're saying if you win on the first two, you still have to win on the third one? Yes, Your Honor, and that's the underlying legal analysis in Hosanna-Tabor and Morsi-Beru is the Supreme Court walks through why do we have a ministerial exception to begin with? And it arises from the First Amendment, and the First Amendment in turn arises from the founding fathers and the colonists and the desire to be free of the king dictating the course of any religious organization. And the way the king or the monarch or the government would do that is by selecting the religious leaders and saying you will pick this person to lead your church, and by doing so controls the future of that religion. So the First Amendment then prohibits that type of establishment, prohibits the preferential... But you're saying this doesn't encroach on that. That's correct, and the reason it doesn't encroach on that issue is Markell... The disputed issue here, first the appellees here have never claimed, not in the district court, not in their briefing, not in any evidence, that their refusal to pay Markell for the bill related to religion. Every other case... Yeah, but I'm not sure. Can we start with is this a religious organization? I mean, these are interesting issues, but what is your position on why this is not a religious organization? If we're looking at why this is not a religious organization, and I think the facts on this are disputed, first it competes with for-profit organizations. It represents to the federal government and other filings, and we've cited those other district court filings, that the work it does is not a religious act. It doesn't have a school or a synagogue or an educational program. They admit it. They don't have... But don't they... What else do they do? I mean, in this particular case, they clearly do some religious aspects because, like for example here, they're providing... They're overseeing a religious practice of kosher food, right? Well, the issue, at least the way the OU has presented it elsewhere, is that the certification itself is not a religious act, and that's the OU's own briefing to the district court in New York regarding a series of other issues regarding religion, but the point that the OU makes, and that we've made throughout, and that's why it's disputed here, is that when they go to... That the eating of kosher food may be a religious act. It may include some doctrinal approach, some religious approach to the way you live your life, but the certification itself, putting the OU mark on a product is not a religious act, and... Well, that may be, but determining whether it's kosher and prepared in a kosher way, that does seem to be a religious act. That part, setting guidelines like that, could be, except that here the OU provides, and the OU will admit, and it's undisputed, that the concept of kosher applies only to food, and we've reduced evidence that the OU admitted at deposition that they use this as a marketing tool. They pitch businesses. This is a marketing tool that you can put on, and the proof of that is they have, for example, their certification, their kosher-to-eat certification on gloves, on jewelry cleaners, sonic jewelry cleaners... I mean, but this, you know, if you were here for the last argument, this does get into some treacherous waters. You know, would you be asking a court to decide whether kosher wine is a marketing tool or something inimical to the Orthodox Jewish faith? That seems like a very difficult thing for a court to have to start to wade through. No, and I agree, Your Honor, and that's not something that needs to be adjudicated in this case. In fact, even if, and there is, Mr. Markell is not making wine. Despite working at a winery, he creates a grape concentrate, it's a food additive for each of the other items, and so they make grapes, they crush the grapes, they create into a concentrate, but, and this is why I think the issue, the core issue is does Markell's claim reach this issue? You know, to Judge Sanchez's question, the court would not have to adjudicate. If we went to trial on this case, no question would be asked, was the OU's policy a legitimate policy? Did Markell follow the strict religious requirements of anything, assuming there were religious requirements? Right, but the problem with that is that's true of almost all these cases. I mean, because all these cases hinge on employment actions that aren't necessarily religious in nature, but what the Supreme Court has said is by imposing these employment, these federal employment, or in this case, I guess it's more state employment, right, under California law, by imposing these requirements on the OU, that interferes with their free ability to pick and choose who they want to have as their ministers. Except here, I think what's distinguishable from, let's say, Hosanna Tabor and Morrissey Beru is that they are, first, they were all retaliation or wrongful termination cases. Here, everyone agrees Markell quit. He quit and he said, you, the OU, agreed to pay me overtime, and we have that in the record where the OU writes, here is the rate we paid for overtime. There was one question I had. Is this a state law, sorry we're jumping around a little bit, but is this a state law question of whether he was an employee or an independent contractor under California law, or it's a breach of contract case saying, we had this agreement and you violated it? Well, the complaint doesn't state a claim for a breach of contract. It is a contract-based action, meaning there is an agreement here and the question about whether the OU is, whether Markell is an employee of the OU or an independent contractor, really doesn't make a lot of difference in the context of ministerial exception because the district court saying, I'm not sure what to do here, but I'm not free to ignore the ministerial exception. I have to grant summary judgment on this case. The issue of whether or not there is or is not a ministerial exception doesn't hinge on the independent contractor or employee context here. We assume that for this part of the argument. Is an independent contractor. No, that he would be an employee. Even if he were an employee, then the question is, does the ministerial exception apply? But here Markell is saying, when I first took this job and then for every day after, I worked and I worked overtime and I was paid and I was paid for overtime. There's no argument here like there was in Alcazar. Well, some of the time worked is not compensable because it's part of training. Here, everyone agrees, time worked by Markell is compensable and time worked that is overtime is paid at an overtime rate. The question is the OU disputes. The only dispute is whether Markell worked the hours or not. Let me ask him because I was about to bring up Alcazar and Alcazar, which we may be bound by, I wanted to ask you about that, says that the ability to hire and fire ministers also contemplates other employment decisions like the amount that you pay someone. And so why wouldn't that wrap into claims about overtime? You know, whether you want to create these distinctions with the ministerial exception, just sweep that away and say, assuming we find someone's a minister, the method of payment is out of bounds. It might in a different case where there was a claim by the religious organization that the amount we pay or whether we pay is a religious issue. Here, that's not an issue. The OU has never claimed that it's a religious issue. But let me, you know, Hosanna Tabor doesn't follow that, right? The majority opinion talks about the ministerial exception without getting into whether there's a religious justification behind it or not. And it was Justice Alito's concurrence that teased out what the problem might be with deciding whether something's religious or not as a justification. Yes and no. I want to address Alcazar and then I'll address Hosanna Tabor. So first, in terms of Alcazar, the question there in the court had announced that it was, and quote, our holding today is limited. The ministerial exception may not apply to a seminarian who obtains employment with a church outside the scope of his seminary training. And that's the language of Alcazar making clear that let's say Rosas, who was the plaintiff in Alcazar, worked for the same church, but it wasn't part of his training. He could get paid for that. And that would be a separate question not governed by Alcazar. Okay. So doesn't that roll in to the, and I think you were going to answer the next question, but so whether you, I'll let you choose which order, but doesn't that roll into the question about whether he's a minister under the ministerial exception? Yes, I think we could, and we should discuss that issue. But I think if we look at first, and I will answer Hosanna Tabor. The question there was the firing of the employee, the claim by the religious organization was the firing itself was based upon a religious view that when you, the plaintiff, threatened to sue us that violates our religious tenets, we are not going to employ you anymore. And the court then says, the Supreme Court correctly, my view says, we can't touch that religious issue anymore because now we're in the business of adjudicating whether or not that's a religious belief that's legitimate or not. We will not do that. And here what we're saying is there is no claim that there is a religious belief. Yeah, but, but I thought Hosanna Tabor went for, I'd have to pull it up, but I thought it went further and said, it's not just about hiring or firing, but we can't have a court enforcing monetary damages against a religious organization because that would be inherently entangling the courts in this process. Yes and no. It is a finer point, a slightly finer point than that, in that, yes, we cannot impose damages, which would result from a religious decision. But in the event there was a, there was something that didn't require the adjudication of a religious decision, we're now back outside the First Amendment protections because the First Amendment is designed to prevent somebody, the government, from getting, wading into doctrinal waters and saying, we can't, we're going to decide, was that a legitimate firing? And so there's no damages or it's an illegitimate firing that requires an adjudication of whether or not somebody's religious. The danger of opening up the possibility of litigating, let's take a rabbi who's working many hours and is working overtime and wants to be paid more than the, you know, by the synagogue than he's being paid. Wouldn't it start to become difficult if a court starts to get into whether they're entitled to more pay or not and whether that affects or deters, you know, the religious institution from hiring other rabbis that, you know, it, it gets beyond hiring and firing, doesn't it? If you start to get into some of that nitty-gritty. It might. And that's, again, goes back to internal religious governance, the hiring, firing training of, of ministers or the people who work there who might qualify him to the minister title. But it would have, would require the synagogue to say, meaning the courts aren't going to assume there's a religious basis for an action unless the defendant says there's a religious basis for this action. And then the court, and I believe your honor had mentioned this in the prior argument, at that point, the court might say, we go no further. But your point is they haven't raised that. They haven't said, but I don't understand. Well, we'll, we'll hear from them. I don't understand how there wouldn't be a religious basis because it does affect, well, assuming that this was a religious function, it would affect that. It doesn't because the, the OU is a $120 million a year organization that pays their, their CEOs high six figure salaries. And there's nothing wrong with that. But they also agreed to pay Markell overtime and they don't ever take issue at deposition in the, the motion work before the district court or here before your honors with the, with the idea that they will pay overtime. And the testimony is we do pay overtime for this type of job. We paid it to Markell and we would pay it if we believed he worked these hours, but he didn't work these hours. We dispute that. So just so that I am clear on your argument, your, your position is that the religious organization would have to assert a religious justification. And then under Hosanna Tibor, the courts might say, well, then that's out of bounds. We won't even reach that question, but if it's not asserted, then it might end up being in something that can be cabined off and potentially litigated. Two answers. Yes, but a qualified, yes. It would have the religious, because again, the courts can't wade into what is and is not a religious decision, right? But if the religious organization said, well, this was a religious decision, the court would then have to find, I need to adjudicate that issue. Meaning if the religious decision does not need to be adjudicated, then there is no more ministerial exception because the court is free to adjudicate anything that doesn't touch upon religious governance. So yes, if the court were to say, well, the defendant says that it's a legitimate religious belief, they don't pay overtime. Then the court might say, well, do I have to adjudicate whether they should pay overtime? And then the answer is, that would be fact specific. But here, since there is no nexus and there's no claimed nexus between paying overtime and the testimony from the OU is we did pay Markell overtime, we would pay him overtime again if he worked the hours. Well, if it were to go to trial, the question for the court or the trial of fact would be, did Markell work the hours? And if he worked the hours, is he entitled to overtime based upon what the OU writes? And the OU's actually- So the approach you're saying to take, and I know you're in your time, so the approach you're saying to take is one approach, but it would require you to, it would necessarily, you just said earlier the word nexus, right? It would require courts to make some decisions about whether something was affecting, and it sounds like you're affecting religion. And you're saying we'd be really, you know, maybe you'd have to be really deferential, but there's no question you'd have to, you'd have to have, that would be the approach. And those would be some thorny issues, unless you back way off, and even then it would be thorny, in which case it would, and then maybe it stops being thorny, but now it feels like you're just deferring to, you know, to religious entities saying stuff is religious when we all know it's not, but we can't adjudicate the question, because there's another approach, which is just, which is to focus more on the role. You heard all our questioning about that in the earlier case we had. And then once you have that role, once that role, then you get the exception, and you just don't, then that is accepted, regardless of whether the entity puts forward a religious justification, because at the end of the day, even if, you know, let's say they're just, they're just waging our claims, or just that kind of thing. You know, to go back to the the rabbi example, and I don't understand Jewish religion to the extent of, but let's assume that, you know, they, we decide we need to have 500 rabbis, but we can't have 500 rabbis because we don't have enough money. Well, the reason you might not have enough, we can only have 450, so some of our, some of our synagogues are going to be short, I guess. And the reason you don't have 450, you know, it's, it's, it's a tangential cause and effect, but the reason is, is because you've had to pay out all this money on, and maybe, maybe it goes to some other religion. So why wouldn't you just say, the question is what the person's role is, ministerial, and, and, and not have to get all tangled up in these questions about, is the particular thing that you're trying to adjudicate going to affect religion or not? A couple reasons. First, because the courts have always held, there is a, we've cited a California Court of Appeal case, the Sumner case, where churches, just like everyone else, are free to contract. They're free to bind themselves in any way, and they can't then later come back and say, actually, what we agreed to, to lessen our rights, we now want to undo. Well, sometimes, and that's funny because I, I don't know as much about you, but I do know some about some Christian, and some Christian traditions would say, you're free to contract, but you're not free to force those contracts in court. That is a Lutheran. And so that would implicate that, that, that issue. It would, except that in Osana-Tabor, there was no agreement that said you're barred from litigating or anything like that, and the termination itself was based upon that representation. I'm going to sue you, and they said, that's against our religion, now you're fired. The protection for that would, is, is built into the fact that it's not like, it's not just like religious entities get to go out throughout the world and break their contracts with non-adherents. These, all these cases, to be a minister, presumably, you also have to be an adherent. So you're sort of, you've come, from the earlier caveat, enter, fire, beware, you know, if you're going to join that religion and then take on this role, maybe there is a sense in which, like, I guess, you're going, you're agreeing to, you don't get to sue in the, in the court systems outside that religion. There might be. First, assuming that you're a practitioner, the way you're discussing, but it, that would then countenance fraud, and there is nothing which countenances fraud so far, meaning at the beginning, and this is what we've cited, the emails from the OU saying to Markell, we'll pay you this, and we'll pay you X on overtime, we'll pay you 37.50 on overtime, and Markell says, count me in. He's now going into this, not on a buyer beware, on a reliance based upon what the OU has. Buyer beware is, is being a part of that religion, you know, I mean, you know, you could only. Except that Markell is not, he's not a trainee, he's not a minister, there's no offering of any seminary courses. And that's, that's where we get into whether he's a minister, that, under the exception. Can you, we're just going to take you over, I mean, you know, it's the last case, you know. Thank you, I appreciate the time. We'll get, so can, can you give us some examples of cases post Morsi-Beru that have, have found them, an individual not to be a minister? I can't partially because it appears to me, and this is just my reading of the decisions, the way, the same way the district court said here, is that the Supreme Court articulated a test in Hosanna-Tabor, then re-articulated and slightly expanded in Morsi-Beru, and then courts almost treated it like the third rail. Yeah. Oh, somebody says the word religion, and there's a religious organization. Well, I don't want to touch this. And I understand it. I mean, the judges got burned a little bit, and, and our court got burned a little bit, twice. I mean, both cases, Beale and Morsi-Beru were decided together, and and, and it is, I mean, I'll, I'll ask your colleagues and the other, for the other council about this, because it is concerning about where this principle ends, and maybe it shouldn't. I don't, I mean, but, but for purposes of this, he, I don't understand. I, I guess that's why you're sort of creating these other arguments, because I think you sort of recognize you're, you're, you're pushing the rock uphill when you, to say he's not a minister. So you're saying there's another way you can win here, and that's smart move, because I, it seems like under existing case law, he seems to be a minister. He's performing a religious function. I mean, in some ways, you have stronger, a slightly stronger argument on the, whether it's a religious organization, but as to the minister, I don't understand how this wouldn't fall within the minister, within that function. Right, and I understand, I and the minister finding doesn't require a title of minister, but if we do walk through, and I could do it briefly, just the elements of what we're talking about here, because Hosanna Tabor did articulate that four-factor test, the title, no one calls him a rabbi in relation to the client, and they, everyone admits he's, he's not a rabbi. I understand the title is not in any way. Right, I mean, we had teachers. Yes, there's teachers and organ players, as your honor had mentioned, but then the question is, what is the job he's doing, and the declarations we have from Mr. Poggi and Mr. Markell is that he does the exact same thing as every other factory worker who doesn't work for the OU, and in fact, the OU instructed him, non-Jews can do the same work you're doing in many, many of the instances, if not all of the instances. He's cleaning vats. He's moving things from one place to another. He's changing out hoses. There is no congregation. There's no every day. He's the sole OU employee there, and he's working either, you know, sleeping on the couch when he's on call, and they're reconstituting grape juice, or they're crushing grapes, or they're doing other things to make food additives, and each time he does that, his job is to simply run down a checklist, and as he runs down the checklist, that's all he does. He doesn't make any discretion. Did he have some religious training involved in that, or at least experience related to it? He did not. He was born a Jew, and he went through ninth grade at a Jewish day school, and then that was it. I mean, he needed a letter from a rabbi to affirm his faith and other things. He needed a letter from a rabbi saying that he observed the Sabbath, and he got that letter, but he also, and we've introduced a substantial amount of evidence where other people who applied for the same position, some of them might need the letter, but they don't require any knowledge of Judaism. They don't need a special training. They don't have any special training, and the OU doesn't ask for any special training, or knowledge, or anything religious. There's no blessings. There's no sacrament. There's nothing which would require him to do anything Jewish. But what's ironic in the more, I mean, in the, I think it was Morsi Beirut, or there was a Lutheran teacher at a Catholic school, so like you don't even have to be a religious adherent to it, but they, but she'd agreed to abide by the Catholic doctrine, and I sort of see this, a similarity here, where whatever his background is, that checklist, you call it a checklist, but that checklist is pretty important to a religious function. Yes, except in Morsi Beirut, what had happened was the teacher had agreed and then participated in a lot of deference to teaching. Teaching itself has a very powerful, because it is the nature of teaching to chart the course of the religion for the future, and so each time someone taught and then said, I reaffirm that I'm going to teach in accordance with these types of religious ideas, well now we really can't get into the employment decision. But in this, I think, takes me back to the, there's the Alamo case, Tony and Susan Alamo Foundation, where the court does make clear, it says it oddly enough in a kind of flippant way, it says, quote, it is virtually self-evident that the free exercise clause does not require an exemption from a governmental program unless at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights. And that's where, and then Hosanna Tabor and each of them focus on the selection of the minister, because they were saying, you can't tell me I can't fire my ministers, I need to fire a minister if they don't believe the way I believe or practice the way I practice. But what we're saying is, when you focus on the freedom to exercise religion, the defendant hasn't even gotten up here, the appellees haven't even gotten up here and said, paying Markell overtime for time he worked somehow impacts our freedom to exercise our religion. Let me push back on that, and I know we're over time, but because I struggled with that in preparing for this case, and yet we have this 1999 case, Ballard, which, and you may have read it, but we said specifically the ministerial relationship lies so close to the heart of the church that it would offend the free exercise clause simply to require the church to articulate a religious justification for its personnel decisions. And I understand that, and Ballard and Elvig together make up a series of the religious organization doesn't have to say, we won't pay Markell overtime because it's a religious decision, and let me give you, you know, quoting Maimonides on why, they have to make that prima facie argument that this is going to burden our religion, and then the court will not adjudicate does it or does it not burden the religion. But without that claim it does burden our religion, we would then be left with the court self-guessing as to what the religion might require, and that's why Ballard and Elvig... I guess to push back a little bit, I was looking at Morrissey-Beru. In Hosanna-Tabor there was a religious justification given for the firing, but I didn't see one in the companion cases. I think it was in one case, in the Morrissey case, it was just not renewable of a contract, and so I guess what I might push back on is the made earlier that the religious organization has to affirmatively make a religious justification for that employment decision, because I don't see that in the Supreme Court in the latter case. In Morrissey-Beru there is too. First the one where the woman says that she was entitled to medical leave and she was discriminated against based on that. The church, the religious organization did then say, well this is a religious issue. On the teacher who said I was being replaced for a younger teacher, this is age discrimination, the response by the church was she was having trouble teaching some courses and adapting to the new way we were going to teach, and that in and of itself, the fact that it involves can she competently teach in a religious school, then the court's not going to weigh into, well would she teach well enough in this kind of case? That's a religious issue. The religion's entitled to say that's not good enough for our contract. Here again, and so they did in their own way present an argument, yes, the religion aspect will be invaded or will be adjudicated during the course of the adjudication. One of the things that Elvig and Bullard both looked at was what's the relief sought? And I heard your honors ask that of the prior case. What's the relief sought in this case? If it's retrospective and it's, and in Elvig for example, the court struck all prospective relief, all punishment for wrongful termination that would relate to the decision by the religious organization, yes, you're right or no, you're wrong, we're going to punish you in the future, not okay. But the claims which did not require adjudication of a religious issue, the court allowed to go forward. That's in Bullard. Bullard and then. It's not clear that that's still good law unfortunately. And then Elvig also would follow it up on Bullard. I agree it's not clear, but that is what your honor had the question. No, we've taken you way over. We'll make sure to give you at least a couple of minutes. Good morning, your honors. Leonora Schloss for the appellee, which I will refer to as the OU. Well, I think your honors understand what the issues here are. And it's just a few questions that have to be answered. Was the appellant Markle correctly decided by the district court to be a minister of the appellee? Whether the district court correctly held that the OU is a religious institution? So can I ask some questions on that? Because I mean, this is a corporation. It's not for profit. Is that correct? Correct. Okay. Where do we draw the line? For example, if you just had, say you had craft food, say, you know what, we're going to, we're going to, maybe they do this, I don't know. We're going to do a kosher line. And, you know, so we're going to hire this, you know, Jewish individual to come in and ensure that this is all done and we're going to send it out. And then, I mean, would they be entitled to, would they be a religious organization for purposes of that? I obviously wouldn't make all the other stuff that craft does religious in nature, but for purposes of that, would they have an exemption from hiring and firing that individual because they were involved in a religious function? And I would say not because, I mean, the case law says how you determine whether a religious institution qualifies from the ministerial exception. It's the key inquiry is whether the organization's mission is marked by a clear or obvious religious characteristics. That's in the Grouse Goat and the Chalisa Bow cases. And, you know, to your example, craft foods, its mission is not marked by a clear or obvious religious characteristics. VOUs, on the other hand, is. It was incorporated as a religious corporation and its mission is to further orthodox Judaism. And it promotes that through advocacy programs, through youth educational programs, just youth programs, and also its kashrut or keeping kosher division, which ensures that religious Jews can, you know, see the certification and know that the food that they're eating is kosher pursuant to their religious beliefs. So that's the distinction. Okay. And I think the opposing side made the argument that if some profit or some excess revenue is generated from it and then reinvested in it, does that alter the characteristics of it being a religious institution, organization? Well, I mean, it's a, the IRS has determined that it's a 501c3. There's evidence in the record to that effect. And there's also testimony from the OU individuals, the PMK, saying that the money that it gets from the selling of the kosher certification, it then puts into its other arms of its, you know, its other arms, the non-kashrut division, the advocacy, the education, the youth programs. So what if it had a dual function? And I don't know that I see that here, but if it had a dual function and it also had, you know, something that was non-religious that it was doing, and they started putting money into that, would that diminish the religious organization? If they were making profit off of this and putting into that, would that diminish the religious organization test? I mean, that's hard to, it's hard to say, I mean, in terms of where, where do you draw the line there? Because that's not the facts in this, in this scenario. Well, I'm just wondering if it's as easy as saying, hey, it's 501c3, the IRS has defined this, whatever is under those rules. I mean, because at the end of the day, we've got to come up with a test. We sort of have a test. We, we're not writing on a blank slate. We have, I think you might've been reading from, you know, a prior opinion on this, of what the test is for the religious organization. But I'm wondering as we refine that, if we just say, you know, it's, it's has a religious mission, it's a religious, you said it was actually, it's a religious corporation? It's incorporated as a religious corporation under the laws of New York. Correct. Okay. So, you know, to, to your point, yeah, I mean, presumably the IRS would have a problem if there was this other large part of it that was not complying with the 501c3 aspect. But again, that's, I mean, that's not the, that's not the issue that we have here. Can you expound a little bit on the underlying dispute here? I, for some reason, I was thinking there was a question about independent contractor versus employee. It sounds like that's not the issue. It's more, much more breach of contract based. No. Okay, go ahead. The difference of opinion. I mean, the, the causes of action are that he is, you know, he's claiming that he was misclassified as an independent contractor, but that he'd been, the fraud claim is basically you fraudulently failed to hire me as an employee at a certain higher compensation. So that, that's why, that's why I had that impression then. It sort of is a question about whether it was misclassified. It is. I mean, right. I think the two sides disagree. But then he's also got this other claim that seems like separate from that, you had agreed to pay overtime and you had paid him overtime for some period of time. Not exactly. Okay. What, what, what, what was the, the testimony was that he was paid a bonus for extra hours. There were supposed to be 12 hour shifts. And when there were occasions when the other mishkiach who was supposed to show up for the next shift was unable to attend and, um, appellant had to stay later, he was paid a bonus. Now, um, I, I know that there was an email that someone at one point had sent that referred to overtime and the, the PMK, um, at deposition said, I've never seen that email. I was, I was not aware. I mean, this, this position was not, this was never entailed to pay overtime because he's, because he was not an employee. He was an independent contract that the agreement was not hourly based. It was, here's a salary, here's the job, however long it takes. No, it was basically that it was like you work a 12 hour shift and then here's the job. It wasn't, you know, as many hours as you have to, it was entailed to be a 12 hour shift in the contract. Sorry. The contract itself did not provide for overtime. I'm not sure that there was a written contract necessarily. So that mean that might've made it to answer your question. But, um, the, the agreement was, you know, this is, this is how you'll work. And then there were a series of emails over time where appellant was requesting additional things and the OU did not necessarily, did not necessarily provide them. Is there a tension between the notion that someone is an independent contractor and so you're maintaining, maintaining some level of distance from them with that relationship, but then also claiming that they're a minister serving a religious purpose for your organization. Isn't there a little bit of a tension between those two things? I mean, potentially, but I mean, I don't really see it that way because how you classify someone, you know, whether they're going to be exempt or non-exempt and entitled to overtime, whether they're going to be your employee or your independent contractor, those are all employment decisions. So I mean, he's, he's clearly bringing employment claims, um, despite that, that characterization. So I don't necessarily see that there is. So what, could you respond to your friend's arguments about, uh, whether he was performing some sort of a ministerial role where that other, other people, uh, could do the same function, uh, as he, and there was a lot of just regular tasks of cleaning barrels and other things. What, why do you disagree with that? Well, for one thing, because of the very nature of the grape product, um, the grape concentrate, grape juice, uh, grape products and wine in Orthodox Judaism have a, um, religious significance because the wine would come and the product, you know, can be used for sacramental reasons. So it's very important that only a religious Orthodox Jew touch the product until it's what's to say that the factory workers could touch it. Sure, they could for the non-kosher product, but for that product to be kosher, only someone who had that letter from the rabbi and keeping in mind that his letter from the rabbi, you know, said not only that he observed the Sabbath, but also that he was an Orthodox Jew. He observed the Torah, he observed keeping kosher himself, and that he had years of experience as a mishkiach. Um, I, you know, I know other had said that he only went through ninth grade at a Jewish school. That may be correct, but he grew up in an Orthodox Jewish home. His father ran a kosher certification agency. He worked for that agency. He worked at another kosher certifying agency prior to the OU. He had the experience and he had the important qualifications of being a religious Orthodox Jew so that he could touch that product. Do you believe, uh, is it, uh, I guess the Fourth Circuit case found that the function itself also was a religious function. I guess I sort of see this as two concepts. One is that the, that the process of certifying kosher foods is itself a religious practice or, or ceremony of some kind of ritual. And then the other is that it's just an essential task for, for, uh, a religious purpose. Do you see it as both or one or, or the other? Well, the Shalisabu case was absolutely right. It is both. Um, it's, you know, there's, there's an importance. There's, it's the reason the Shalisabu case found that, um, that he was a minister. It's because you're saying that given the importance of dietary laws in the Jewish religion, you know, we can't say that the duties of mishkiachim don't involve Jewish worship and ritual. Um, there's, there's something involved. It's not necessarily just looking, you know, going through that, that checklist. It's doing it understanding, you know, that I'm doing this for the purpose that it's going to render this food kosher. Because if any step wasn't followed, that product then could not be sold as kosher. Are there, as I understood, it couldn't be certified, sorry. Are there circumstances where he would have to consult with either a rabbi or other religious authorities to determine whether something is being maintained or the process is kept in a kosher way? Yes, no, absolutely. Um, there's, there's evidence in the record that he would, um, request, um, he would, he would report to the rabbis, um, higher up in the organization if he had certain questions. He reached out to the post scheme or the experts, you know, for what are called sikhedinim, which are rulings, like rabbinic rulings on, you know, so he could make some determinations about what happened here. He was the one who had to decide, has this, you know, in terms of boiling the product, has it reached the sufficient temperature to be mevushal? Now he'll say, I was told what temperature it was. Well, all right, but it's still significantly important because if a non-Jew touches it before it's been boiled to that temperature, then it's not fit, it's not kosher, and you can't be certified. And, I mean, a religious Jewish person who then drank or, you know, or ate that product would be very upset to learn that it was not, you know, that those steps had not been followed. So those steps are not minor. They go to the very heart of practicing Orthodox Judaism. And what do you make of Mr. Friedman's arguments about, I guess, moving to the third point, assuming Mr. Merkel is a, is a minister, that there's a distinction that can be drawn between these sorts of our claims, and, and it depends on whether the OU is asserting a religious justification for, for the payment scheme. Well, I mean, there's, you know, there's this religious justification required. I mean, I, I don't see that in any of the, of the cases. I mean, I, I think Judge Nelson, you had mentioned from Hassan Tabor that, you know, that the ministerial exception, you know, bars litigation over ministerial decision, whether or not made for a religious reason. And then, of course, a series of Ninth Circuit decisions, you know, bollard saying the ministerial exception lies so close to the heart of the church that it would offend the Free Exercise Clause simply to require the church to articulate a religious justification. Then Elvig, because the church cannot be required to articulate a justification for such ministerial decisions. Werft, the church would necessarily be required to provide a religious justification, and this is an area into which the First Amendment forbids us to tread. Alcazar 1, the very process of civil court inquiry into the clergy-church relationship can be sufficient entanglement. Alcazar 2, it would offend the Free Exercise Clause simply to require the church to articulate a religious justification for its personnel decisions. So, I mean, it's an interesting extra requirement that he's trying to create, but it's, it's not in the cases. And as you noted, Judge Sanchez, several, several cases do not contain within them any such justification, and the courts had no problem finding ministerial exception applied. So, your position is we really have, you, you think we have two questions to answer, which I think is all the district court answered, was it's a religious organization and it's a ministerial task. And then the third question being, are the claims barred, which it also answered affirmatively. And that's if they fall within the employment context, right? Or, go ahead. I mean, they, they, well, the claims are employment claims, you know, overtime, so then improper wage statements, a 17-200 claim, you know, premised on- And I guess their argument is, no, they're not part of what's already been barred because even though they might touch on an employment, they're, they're, they're more, you know, a breach of, I guess, breach of contract. It's hard to know what they're arguing, but I mean, in terms of, you know, they are wage claims. I mean, it's, it's a little late. They're barred at this point from trying to amend the complaint. And, you know, the claims are what they are. And there's nothing, there's nothing unusual about these wage claims. I mean, Alcazar, you know, definitely held that wage claims were, were barred. Shalisabo did. Ministerial exception of bars, and in this case, Amishkiach, the same role. The FLSA claim for unpaid wages. Schleicher versus Salvation Army, which is a Seventh Circuit decision. The ministerial exception bars ministers' FLSA claims for unpaid overtime and minimum wages. So there's several courts that have already held that, you know, that, that you go to this extra step. I mean, Elvig said, you don't just look at the claims, but you have to look at the remedies, and the remedies are also barred. And that's what Alcazar had relied on in coming to its conclusion. And, and what are the remedies being sought here? Well, so that's interesting. So the remedies are sort of twofold. The remedies are unpaid overtime. But then also, I guess, with that fraud claim, which is a, you know, you fraudulently failed to hire me as an, you know, as, as a salaried employee at this higher salary. So that would, so basically, it's reinstatement. It's, it's either reinstatement, bring me back. Well, why wouldn't that just be a damage, why wouldn't that just be a damages claim for what he would have been entitled to? Well, then I guess at this point, it would be. It's all money. We're, we're talking about money. Okay, it would, it would be money. But then, as Hosanna Tabar said, a front pay in lieu of reinstatement, back pay, compensatory and punitive damages, and attorney's fees would operate as a penalty on the church, and would be no less prohibited by the First Amendment than an order overturning the termination. So it's, yes, it's monetary damages, but the kind of penalties that Hosanna Tabar, that the Supreme Court said are the penalties here. Okay. I mean, you have some time, but you don't need, you're not, it's not mandatory to use it all. I've answered your questions. I think we're fine. Okay. Thank you, counsel. And we'll give you two minutes for rebuttal. Thank you so much. Torn, where to start, but I think we should start with the OU's own words. And so ER-128, quote, this is the email to Markel, here's what we'll pay, quote, $25 per hour, $37.50 overtime pay after eight hours. That, and then Markel's response, quote, consider me confirmed. Thanks, Yaakov Markel. That's the initial relationship. That's how he gets into this. The OU's words at ER-475, the filings were a different district court, quote, individual, the labeling and sale of foods as kosher is not a religious exercise. Individuals who are not Jewish or who do not observe Orthodox Jewish law can prepare and sell kosher foods in the same way that those individuals can sell any product. Continuing on, quote, I just, this feels a little bit like saying, I've got some Lutherans to say this. They've got some Lutherans to say that. That really feels like you're asking us to decide. I have the OU who says this. So this is not some other entity. This is themselves. I think you're asking us to decide like a disputed religious question maybe there. And I'm, if it is disputed, first it would, then I think there'd be a trial, but not on this legitimate issue of what, not on a religious claim. This is an affirmative defense. Meaning the defendant here has the absolute burden to demonstrate all the elements necessary by evidence. And if any of that's disputed, it must go to the trial. And what's gone on here is, and I'll quote from Morsi Breu, because the concept of the ministerial exception does not extend as far as this absolute rule that the OU is arguing for. They're arguing for a rule where they're absolutely barred from ever paying minimum wage, ever paying overtime under California or federal law. Well, I think that is the rule if they're a minister and they fall within the exception. Except that's not as far as Morsi Breu went. Morsi Breu's conclusion was, quote, this does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission. The OU has not met a burden of saying whether or not we pay overtime is a central issue on our central mission or it's essential to it, and they haven't even claimed it. And you might be right, and the Supreme Court hasn't spoken to it, but it seems as if we might be bound by our prior circuit decisions that do encompass a broader notion of the ministerial exception for employment decisions. Except in each of those cases, again, the court found that there could be cases, and there certainly would be cases, where someone, Alcazar is a prime example, or Elvig, where the court allowed relief. No reinstatement relief is sought. The only relief sought is, I worked X number of hours. Mr. Markell is out $568,000 of hours that he worked and overtime that he worked, that the OU just says, we don't think you worked it. If the OU agreed that Markell had worked it, it would have been paid. There's no religious issue that needs to be adjudicated there, because Markell is saying, I showed up, it wouldn't matter where he showed up. In Shele Asaba, there's a Hebrew home, they're functionally running a live-in Jewish experience, and that individual was hired by a rabbinical organization, disciplined and trained by that independent rabbinical organization. Here, the facts are in dispute about whether Markell needed the experience, needed the qualifications. The fact that, and counsel, I think, conceded inadvertently, that any Orthodox Jew on the planet, training or no training, would be a minister if they started to work for the OU, and that's never been the rule. The rule always looks to the amount of training, the qualifications of the person, the significant degree of religious training which the person accepts upon themselves to take on this role, or volunteers as a reason to get the role. But what Markell's looking at, if this were to go back to the trial court, the only thing that needs to be decided is, how many hours did Markell work, and did the work that he performed go beyond the eight hours, the 12 hours? And then, should he be paid for that time? And the argument here that overtime is governed by the ministerial exception requires, as a prerequisite, that it interfere with the internal governance. And the OU has admitted there is no internal governance which says, we do not pay overtime, or we would not pay overtime. Okay, thank you. Thank you to both counsel for very professional arguments in these cases, and the case is now submitted. Thank you. I'll rise. This court for this session stands adjourned.
judges: NELSON, VANDYKE, SANCHEZ